USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2 /11 /19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KRISTIN RIGHTNOUR,

                    Plaintiff,                16-cv-3527 (JGK)

          - against -                         OPINION & ORDER

TIFFANY AND COMPANY,

                    Defendant.

JOHN G. KOELTL, District Judge:

The plaintiff, Kristin Rightnour, brings this action
against her former employer, Tiffany and Company ("Tiffany" or
"the defendant"), alleging that Tiffany violated Title VII of
the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq.
("Title VII") and the New York City Human Rights Law, New York
City Administrative Code § 8-107 et seq. ("NYCHRL"), by engaging
in unlawful religious discrimination and retaliation. The
plaintiff, who is a practicing Catholic, primarily alleges that
the defendant engaged in unlawful religious discrimination when
it took various disciplinary actions against the plaintiff, and
that the defendant retaliated against the plaintiff for sending
a letter from her attorney and filing charges with the Equal
Employment Opportunity Commission ("EEOC"). The defendant
contends that the plaintiff was disciplined for
nondiscriminatory and nonretaliatory reasons including her poor

leadership and communication skills that involved abrasive and insensitive comments to others in the workplace.

The defendant now moves under Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the plaintiff's claims. For the following reasons, the defendant's motion is **granted**.

I.

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs. L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment should be granted against that party. Celotex, 477 U.S. at 322; Fed. R. Civ. P. 56(c)(1)(B) & 2010 Advisory Committee Note.

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

Although the Second Circuit Court of Appeals has noted that district courts should "be especially chary in handing out summary judgment in discrimination cases, because in such cases

the employer's intent is ordinarily at issue," <u>Chertkova v. Conn. Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996), a plaintiff must rely on "more than conclusory allegations to resist a motion for summary judgment, and show more than some metaphysical doubt as to the material facts," <u>Gorzynski v. Jet Blue Airways</u>, 596 F.3d 93, 101 (2d Cir. 2010) (internal citations and quotation marks omitted). The Supreme Court has instructed that courts are not to treat discrimination any "differently from other ultimate questions of fact." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000) (quotation marks omitted). For example, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." <u>Id.</u>

II.

The following facts are undisputed for purposes of this motion unless otherwise noted.

A.

Defendant Tiffany and Company is a luxury jewelry and specialty retailer with worldwide distribution centers and a global headquarters. Def.'s 56.1 ¶ 1. Tiffany's marketing is

4

performed by a Global Marketing Department and various regional marketing departments. Id. ¶ 2.

Tiffany hired the plaintiff in October 2013 to fill the role "Director of Marketing - Fashion Category for Northern America." Id. ¶ 7. In that role, the plaintiff was responsible for the overall marketing strategy and budget planning for Tiffany's fashion, gifts, and accessories categories. Id; Lacaze Decl., Ex. 2.

The plaintiff had three managers during her tenure at Tiffany. When the plaintiff was first hired by Tiffany, she reported to Andrea Davey, whose title was "Vice President - Marketing, Northern America." Def.'s 56.1 ¶ 10. Davey transferred to a different team in early 2014, and upon Davey's transfer, the plaintiff began reporting to Catherine Lacaze. Id. ¶ 11. Adrienne Davis, who originally reported to Lacaze alongside the plaintiff, was given a promotion in April 2015. Id. ¶¶ 11, 65. When Davis was promoted, she became the plaintiff's direct supervisor. Id. ¶ 66. The plaintiff supervised two employees, Jennifer Greene and Caitlyn Byrnes. Def.'s 56.1 ¶ 8.

The plaintiff is a practicing Catholic. Pl.'s. 56.1 ¶ 100. Jennifer Greene is Jewish and Caitlyn Byrnes is Catholic. Id. Lacaze was raised in the Catholic faith and went to Catholic

school but no longer practices, and Davey is of Jewish heritage but not religious. Id. ¶¶ 92-93.

Although the plaintiff delivered satisfactory performance in certain aspects of her position, the plaintiff displayed partnering and communication deficiencies early on. Id. ¶ 12. Beginning in early 2014, Lacaze and Human Resources ("HR") began receiving complaints about the plaintiff's abrasive communication style and lack of professionalism. Id. ¶ 13. For example, in early 2014, Tiffany received a complaint that the plaintiff told an employee, who did not report to the plaintiff, that the plaintiff told her she was doing a great job "no matter what others say." Id. ¶ 14. The employee found that comment to be disconcerting and spoke to HR. Id. ¶ 15. Lacaze also received complaints regarding the plaintiff's interactions. Lacaze testified that the plaintiff's coworkers complained that the plaintiff "was abrasive in meetings [and] dismissive," and that she made her coworkers feel "belittled and that [the plaintiff] was contemptuous." Polido Decl., Ex. 6, at 35. The plaintiff also failed to turn in assignments on time. Def.'s 56.1 ¶ 16.

The plaintiff's first performance review was in the Spring of 2014, and it evaluated her performance for her first four months of work. Pl.'s 56.1 ¶ 104. Davey, who was the plaintiff's manager at the time, conducted the plaintiff's performance review. Id. Overall, Davey gave her a positive performance

review, rating her six out of six. Id. However, the performance review noted concern in some areas, including that the plaintiff's approach to managing multiple projects was "not sustainable." Rightnour Decl., Ex. A, at 3-4.

In the summer of 2014, Byrnes reported to Lacaze and HR comments that the plaintiff made that Byrnes believed were inappropriate and made Byrnes feel uncomfortable. Def.'s 56.1 ¶ 22. Among other issues, Byrnes reported that around November 2013, the plaintiff commented to Byrnes and Greene -- in reference to a Hispanic security guard at a Tiffany store -- that the security guard was the only person who paid attention to the plaintiff at the store because "Hispanics love blondes."[1] Id. ¶ 23.

Byrnes also reported that around April 2014, the plaintiff discussed Good Friday in a meeting with her direct reports -- Greene and Byrnes. Def.'s 56.1 ¶ 24. Byrnes reported that the plaintiff told Greene, who is Jewish, that Good Friday is when "your people killed Jesus."[2] Id. ¶ 25.

---

[1] Although she does not remember making this comment, the plaintiff does not dispute that Byrnes reported the comment to Lacaze and HR. Pl.'s. 56.1 Counter Stmt. ¶ 23.
[2] The plaintiff does not dispute that Byrnes made this report to HR, but the plaintiff does dispute that she made the underlying comment that "your people killed Jesus." Despite claiming that she never made this comment, the plaintiff later asked Greene to send the plaintiff an email explaining that Greene was not offended by the comment. Def.'s 56.1 Stmt. ¶ 32.

Byrnes also reported an incident where the plaintiff stated that a certain social media marketing technique should be used in Asia because "[a]ll Asians love social media." Id. 56.1 ¶ 27. The plaintiff does not dispute that Byrnes reported this comment, but the plaintiff asserts that she did not make the comment as described. Pl.'s 56.1 Counter Stmt. ¶ 27. The plaintiff states that she shared information based upon consumer behavior research reports showing that social media usage is higher in Asia. Id.

Byrnes also reported problems with the plaintiff's management and communication style, including that the plaintiff micromanaged her direct reports, which made it difficult for them to complete projects on time. Def.'s 56.1 ¶ 29.

Upon receiving the complaints from Byrnes, HR opened an investigation into the plaintiff's behavior, interviewing employees such as Greene, Byrnes, and the plaintiff. Id. ¶ 30. The interviews were primarily conducted by Sylvia Raymond, who is a practicing Catholic. Id. ¶¶ 20, 94. During the investigation, Greene said that she was not personally offended by the plaintiff's behavior. Id. ¶ 31; Raymond Decl., Ex. 2.

In light of the plaintiff's communication, leadership, and partnership deficiencies, Lacaze and HR determined that corrective action was warranted. On September 11, 2014, Tiffany issued a warning to the plaintiff. Def.'s 56.1 ¶¶ 33, 35. The

warning stated: "Because of your work performance and or conduct you are at risk of losing your job." Lacaze Decl., Ex. 5. The warning notified the plaintiff that during the HR investigation, many of the plaintiff's business partners stated that the plaintiff's communication style was "abrasive, condescending, and/or dismissive," and that the plaintiff frequently displayed body language that signaled disinterest in what other individuals had to say, such as rolling her eyes. Id. The warning mentioned the plaintiff's November 2013 comment about Hispanics loving blondes and the plaintiff's April 2014 remark that "your people killed Jesus." The warning explained that the plaintiff's behavior was particularly important because of her role as a leader within the company, which required her to lead by example. Id. The warning recommended that the plaintiff attend a Management Development Program. Id.; Pl.'s 56.1 ¶ 38. Lacaze, Raymond, and the plaintiff all signed the warning. Lacaze Decl., Ex. 5.

Raymond and Lacaze delivered the warning to the plaintiff in a meeting in which they reiterated the consequences of the warning. Def.'s 56.1 ¶ 41. Under Tiffany company policy, employees on active warning are not eligible for a bonus, a merit increase, a transfer, or a promotion. Id. ¶¶ 41-42. Additionally, employees on active warning cannot receive an overall rating higher than "adequate" in their annual

performance review. Id. ¶ 43; Raymond Decl., Ex. 7. When Raymond and Lacaze delivered the warning, the plaintiff did not raise any concerns about discrimination or retaliation. Id. ¶ 46.

Three months later, in December 2014, the plaintiff's attorney sent a letter to Tiffany, claiming that by issuing the warning Tiffany discriminated against the plaintiff on the basis of her religion. Polido Decl., Ex. 7. In that letter, the plaintiff's attorney claimed that the warning was issued because the plaintiff expressed her religious belief that the Jewish people killed Jesus. Id.[3]

Despite being issued a warning and counseled on her deficiencies, Lacaze and HR continued to receive complaints about the plaintiff. Def.'s 56.1 ¶ 50; Polido Decl., Ex. 1, at 264-65, 337-38, 344, 376. For example, Byrnes complained that the plaintiff made an inappropriate comment about Byrnes's financial situation by telling Byrnes that she does not "know what it's like to really need a paycheck" because she "live[d] at home." Def.'s 56.1 ¶¶ 52-53. The plaintiff also attempted to

_____

[3] The letter stated that the plaintiff was issued a warning "for allegedly stating that the 'Jewish People Killed Jesus.' Ms. Rightnour did not make this statement -- although she, as most Catholics, believe it to be true -- and she informed Tiffany & Co. of such." Id. There is no question that Byrnes reported the remark and that the plaintiff asked Greene to send an email stating that Greene was not offended by the comment. At the argument of the current motion, plaintiff's counsel did not know the basis for the comment about what "most Catholics" believe. While not directly relevant to the disposition of the current motion, it is not true that the Catholic Church's position is that attributed to the plaintiff and her lawyer. See Nostra Aetate (Pope Paul VI) (October 28, 1965).

circumvent the consequences of her warning status. Even though the plaintiff knew that she was not allowed to transfer to a different group while under the warning, she contacted another group to ask them about transferring to an open position without notifying Lacaze. Id. ¶¶ 55, 57-58. Discussions about a potential transfer ceased only when senior management contacted Lacaze, who notified them that the plaintiff was on active warning. Id. ¶ 59.

In the spring of 2015, another employee, Burke, complained to HR that the plaintiff introduced Burke to a photographer at a photoshoot as a "crazy bodybuilder crossfit chick." The plaintiff then stated to Burke, "See it can be fun to dress like a girl," and "You should keep that dress, it would help your wardrobe." Id. ¶ 64. Burke reported that the plaintiff made her uncomfortable on several occasions and that she felt as if she was being bullied by the plaintiff. Raymond Decl., Ex. 10.

The plaintiff's March 2015 performance review reflected her active warning status and the feedback her managers continued to receive about her. Def.'s 56.1 ¶ 61. In that performance review, the plaintiff's manager, Lacaze, noted that the plaintiff "continues to struggle with her cross-functional partnerships." Lacaze continued "to receive concerning feedback about [the plaintiff's] ability to effectively build relationships, partner with a variety of groups / people and communicate in a non-

abrasive manner." Lacaze Decl., Ex. 7. Lacaze explained that the
plaintiff's approach to collaboration "is perceived as being too
authoritative and judgmental," and she needed to improve in her
ability to "foster[] a climate of respect." The review explained
that the plaintiff lacked "self-awareness in the way she []
approached global opportunities and senior leaders," and was
"limited in her ability to . . . communicate in a respectful
manner." The review explained that the plaintiff "leaves people
with the impression that she values her work more than their
work." Id. The performance review concluded that although the
plaintiff performed well in terms of her "deliverables," she
needed to improve her "ability to partner and communicate
effectively." Id. The plaintiff received an overall rating of
three out of six, or "adequate." Def.'s 56.1 ¶ 61. Raymond and
Lacaze delivered the plaintiff's performance review, and they
felt that the plaintiff responded to the review in a manner that
was dismissive, which gave them the impression that she was not
open to feedback. Id. ¶ 63.

In April 2015, the plaintiff's peer, Adrienne Davis, was
promoted to the role "Group Director, Brand Management." Id.
¶ 65. This promotion made Davis the plaintiff's direct
supervisor. Id. ¶ 66. The plaintiff was not eligible for this or
any other promotion because of her active warning status. Id.
¶ 70. Lacaze testified that if the plaintiff had not been on

12

warning, Lacaze would have considered the plaintiff for the promotion, but ultimately, the plaintiff's "relationship management and her lack of collaborative skills . . . would have prevented her from getting the job." Polido Decl., Ex. 6, at 133. Despite testifying that she did not know if she was more qualified for the promotion than Davis, Def.'s 56.1 ¶ 74, the plaintiff complained to Davis and other coworkers that the plaintiff felt that she was more deserving of the promotion. Id. ¶ 75.

After becoming her supervisor, Davis continued to receive complaints about the plaintiff, id. ¶ 76; Polido Decl., Ex. 2, at 94-97, 104, 166, and the plaintiff continued to exhibit deficiencies, such as submitting untimely work product. Lacaze Decl. ¶ 43 & Ex. 9.

Having concluded that the plaintiff's performance had not improved, Tiffany placed the plaintiff on a development plan in June 2015. Def.'s 56.1 ¶ 79. The development plan indicated that the plaintiff had not yet attended the management development program, which had been recommended to her ten months before in her warning. Id. ¶ 87. The development plan outlined areas for the plaintiff to improve, including her ability to establish partnerships, communicate respectfully, collaborate effectively, display professionalism, demonstrate self-awareness, and manage time effectively. Davis Decl., Ex. 1. The plaintiff was asked to

provide improvement goals and actions in those areas. Def.'s 56.1 ¶ 81. The plaintiff filled out the plan, but when she submitted the plan to Davis by email, the plaintiff noted that she was "not in agreement" with the issues outlined in the plan. Rightnour Decl., Ex. J.

Davis met with the plaintiff on a regular basis to discuss the development plan. Def.'s 56.1 ¶ 82. Davis testified that she sought feedback about the plaintiff from the plaintiff's partners and peers. Id. ¶ 83. Davis testified that although she received some positive feedback about the plaintiff, the feedback was generally negative regarding the plaintiff's "lack of partnership, lack of ability to work well with others, [and] her lack of understanding and self-awareness." Id. ¶ 84. Davis also testified that she received feedback that the plaintiff continued to micromanage her direct reports and to require excessive revisions, making it difficult for the plaintiff's team to meet deadlines and accomplish other tasks. Id. ¶ 85.

The plaintiff believes that she made efforts to improve on her alleged performance deficiencies, but Davis testified that when Davis shared the feedback with the plaintiff, the plaintiff refused to acknowledge that the plaintiff needed to adjust her behavior.[4] Id. ¶ 86.

---

[4] The plaintiff states that she attempted to improve by, among other actions, "apologizing to colleagues when necessary." Pl.'s 56.1

The plaintiff attended the management development program in July 2015. Id. ¶ 88. The leader of the training program reported that the plaintiff displayed a dismissive and uninterested attitude during the program, which negatively impacted lower level program attendees. Id. When the plaintiff was asked to give honest feedback about the program, the plaintiff gave negative feedback that gave her managers the impression that she did not see any value in the program. Pl.'s 56.1 Counter Stmt. ¶ 91.

Lacaze and Davis, in consultation with HR and senior management, decided to terminate the plaintiff's employment. Def.'s 56.1 ¶ 90. Lacaze, Davis, and Raymond all testified that the reason for the plaintiff's termination was that she did not appear to be improving and she did not show an interest in or willingness to improve. Id. The plaintiff's employment was terminated on August 13, 2015. Id. ¶ 91.

Tiffany did not hire anyone to take the plaintiff's place, but it did hire an individual to perform some of the duties for which the plaintiff had been responsible. That individual was hired with the approval of Davis and Lacaze, and that individual is Catholic. Id. ¶ 96.

---

Counter Stmt. ¶ 86. However, the plaintiff does not dispute that she refused to acknowledge and accept her behavior when Davis shared feedback with her. Id.

The plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on April 17, 2015. Id. ¶ 98. In her EEOC charge, the plaintiff alleged that the defendant engaged in religious discrimination by issuing a warning, withholding her bonus pay, and preventing her from transferring departments or obtaining a merit increase. Further, she alleged that her negative performance review constituted retaliation for her December 2014 attorney letter. Polido Decl., Ex. 8.

The plaintiff filed an amended EEOC charge on June 5, 2015, alleging that the choice to promote Davis instead of the plaintiff was another part of Tiffany's "retaliatory campaign" against the plaintiff. Polido Decl., Ex. 9.

On February 11, 2016, the EEOC issued the plaintiff a "Notice of Right to Sue," which the plaintiff received on February 15, 2016. Compl. ¶ 8. The plaintiff commenced this action within ninety days of receiving the notice of right to sue. Id.

### III.

The defendant moves to dismiss the plaintiff's claims under Title VII and the NYCHRL that Tiffany (1) discriminated against the plaintiff for her religious beliefs and (2) retaliated against the plaintiff for sending an attorney letter and filing EEOC charges.

Title VII makes it unlawful "for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 513 (1993). The plaintiff carries the burden of establishing discrimination by a preponderance of the evidence. Reeves, 530 U.S. at 143.

Title VII discrimination claims are analyzed under the three-part burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the plaintiff must establish a prima facie case of discrimination. Id. at 802. Second, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the alleged discrimination. Id. Third, the plaintiff must show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Discrimination claims under the NYCHRL are analyzed under a broader standard than claims brought under Title VII. Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d

Cir. 2013). Under the NYCHRL "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason." Id. at 110 n.8. The defendant may then present evidence that its actions were taken for legitimate, nondiscriminatory reasons, and the defendant is entitled to summary judgment if the record shows that "discrimination played no role in its actions." Id. (quotation marks, alteration, and emphasis omitted). "Notwithstanding this different analysis, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." Hill v. Bloomberg L.P., No. 14cv9809, 2016 WL 1665599, at *10 (S.D.N.Y. Apr. 20, 2016) (quotation marks omitted).

### 1.

To establish a prima facie case of discrimination based on religion under Title VII, the plaintiff must show that she (1) was a member of a protected class, (2) was qualified for her job, (3) suffered a materially adverse employment action, (4) under circumstances giving rise to an inference of religious discrimination. Atkins v. Pitney Bowes Mgmt. Servs., No. 12cv5575, 2015 WL 144158, at *4 (S.D.N.Y. Jan. 12, 2015).

The parties do not dispute that the plaintiff has satisfied the first three requirements of a prima facie case. The defendant focuses its motion on the fourth requirement, arguing

that the plaintiff has not shown circumstances that give rise to an inference of religious discrimination.

The defendant argues that the plaintiff has not met the fourth requirement of a prima facie case for several reasons. First, there is no evidence that any of the decision-makers harbored religious animus towards the plaintiff or against Catholics. There were three primary decision-makers involved in the decisions to place the plaintiff on a warning and ultimately to terminate the plaintiff's employment -- Lacaze, Davis, and Raymond. Of those three decision-makers, only one, Raymond, practices a religion, and she is Catholic. Lacaze, who no longer practices a religion, was raised in the Catholic faith. Although there is no presumption that employers will not discriminate against members of their own protected class, the fact that one of the key decision-makers is Catholic "undermines any possible inference of discriminatory animus." White v. Pacifica Found., 973 F. Supp. 2d 363, 380-81 (S.D.N.Y. 2013). This is especially so here, where Raymond, a Catholic, conducted most of the interviews for the HR investigation of the plaintiff. Moreover, the plaintiff has not put forward any evidence that a single person at Tiffany made any statements about her religion that could be deemed discriminatory. See Rozenfeld v. Dep't of Design & Const. of City of New York, 875 F. Supp. 2d 189, 205 (E.D.N.Y. 2012) (considering as a factor that "nobody made disparaging

comments" about the plaintiff's race), aff'd, 522 F. App'x 46 (2d Cir. 2013).

Additionally, the plaintiff has not established that she was treated differently from other employees because of her religion. See, e.g., Pesok v. Hebrew Union Coll.--Jewish Inst. of Religion, 235 F. Supp. 2d 281, 288 (S.D.N.Y. 2002) (summary order) (dismissing discrimination claims where there was no evidence that similarly situated employees were treated differently from the plaintiff), aff'd sub nom., Pesok v. Lutwak, 86 F. App'x 479 (2d Cir. 2004). The plaintiff has not shown any similarly situated employee with similar communication deficiencies who was not disciplined. For example, the plaintiff argues that several Jewish managers at Tiffany freely discussed religion at work without being reprimanded. See Opp'n at 13; Pl.'s 56.1 ¶ 103. However, the plaintiff has not identified the nature of these discussions or whether the comments made were offensive, nor has the plaintiff established that these individuals made additional offensive comments[5] or were the subject of complaints by their colleagues. Indeed, when asked if she was aware of other employees making comments such as "your people killed Jesus," "all Asians love social media," "Hispanics love blondes," or "[s]ee it can be fun to dress like a girl,"

---

[5] The plaintiff's argument ignores that she was reported for making at least three other comments in addition to her alleged comment about Jesus's death.

the plaintiff responded that she was "not aware of any other employee's specific situation." Polido Decl., Ex. 1, at 287. Nor does the plaintiff point to any other employees who were reported to their managers and HR for dismissive body language, micromanagement, or an abrasive communication style.

The plaintiff's argument that the circumstances give rise to an inference of discrimination is further undermined by the fact that the person who was eventually hired by Davis, with Lacaze's approval, to perform some of the plaintiff's duties is Catholic. The fact that the person hired to perform some of the plaintiff's duties is a member of the same protected class as the plaintiff "effectively precludes [the] plaintiff from establishing that her termination occurred under the requisite circumstances giving rise to an inference of discrimination." DeJesus v. Dist. One Cmty. Educ. Council, No. 08cv10666, 2010 WL 3959624, at *4 (S.D.N.Y. Sept. 14, 2010); see also White, 973 F. Supp. 2d at 381 (collecting cases).

Because the plaintiff has not shown that discrimination played any part in the adverse employment actions taken against her, she has not made out a prima facie case of religious discrimination under Title VII. Similarly, because the plaintiff has failed to show that discrimination played a role in Tiffany's decisions with respect to her employment, the plaintiff has failed to make out a prima facia case under the

NYCHRL. Therefore, it is unnecessary to reach steps two and three of the McDonnell Douglas framework. However, those steps also weigh in favor of summary judgment because the plaintiff has not shown that the reasons offered by the defendant for issuing the warning to the plaintiff -- or indeed for any of its subsequent actions -- are pretextual.

2.

The defendant puts forward ample evidence that it based its actions on nondiscriminatory reasons. These reasons include the plaintiff's persistent partnering and communication deficiencies, comments that were inappropriate for the workplace, body language and behavior that signaled the plaintiff did not care what others had to say, and micromanagement of her direct reports. See, e.g., Lawless v. TWC Media Sols., Inc., 487 F. App'x 613, 616 (2d Cir. 2012) (summary order) (holding that an employee's poor job performance is a legitimate reason for termination); Portee v. Deutsche Bank, No. 03cv9380, 2006 WL 559448, at *9 (S.D.N.Y. Mar. 8, 2006) (interpersonal friction with coworkers including inappropriate remarks is a nondiscriminatory reason to issue a warning).

Because the defendant has put forward nondiscriminatory reasons for its actions, the plaintiff must show that the reasons put forward by the defendant were "false, and that more likely than not discrimination was the real reason for the"

defendant's actions. Lawless, 487 F. App'x at 616. The plaintiff has failed to carry this burden.

The plaintiff does not dispute that her supervisors and HR received complaints about her behavior. The plaintiff disputes making the comments that were reported, but that dispute is not material to this motion. "The Court is interested not in the truth of those complaints against plaintiff, but only in what motivated the employer." House v. Wackenhut Servs., Inc., No. 10cv9476, 2012 WL 4017334, at *17 (S.D.N.Y. Aug. 20, 2012) (quotation marks omitted). "An employer's good faith belief that an employee engaged in misconduct is a legitimate reason for terminating her and the fact that the employer is actually wrong is insufficient to show that the alleged misconduct is a pretext for discrimination." Droutman v. N.Y. Blood Ctr., Inc., No. 03cv5384, 2005 WL 1796120, at *9 (E.D.N.Y. July 27, 2005); Robinson v. Zurich N. Am. Ins. Co., 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012) ("The question in this Title VII case is not whether defendants' decision to terminate plaintiff was correct but whether it was discriminatory."). In this case, multiple employees reported communication deficiencies on the plaintiff's part, and the plaintiff has not presented any evidence that the defendant did not believe those reports or that its reliance on those reports was pretextual.

The plaintiff also disagrees with the defendant's decisions to place her on the June 2015 development plan and to terminate her employment in August 2015, and argues that because the defendant's decisions were faulty, they must have been pretextual. Her arguments here are similarly without merit. The defendant states that it made those decisions on the basis that the plaintiff was not improving and was not open to feedback. The defendant based its conclusion on the continued negative feedback that Davis received about the plaintiff's partnership and communication deficiencies after the warning was issued and after Davis became the plaintiff's supervisor, as well as on the plaintiff's own behavior. For example, when Tiffany asked the plaintiff to participate in the plan, the plaintiff did, but only under protest, noting in her email to Davis that she disagreed with the reasons for placing her on the plan. And when the plaintiff attended the management development program, the plaintiff delivered feedback about the program in a way that signaled to her supervisors that she was not interested in improving upon the partnership, management, and communication skills required for her job.

The plaintiff attempts to rebut the defendant's perceptions of her behavior and attitude by stating that she was open to

feedback.[6] However, it "is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's reasons are" pretextual. Robinson, 892 F. Supp. 2d at 430. The plaintiff's mere disagreement with her supervisors', colleagues', and HR's "assessment of [her] work performance . . . is insufficient to raise a triable issue of fact regarding pretext." See Iverson v. Verizon Commc'ns, No. 08cv8873, 2009 WL 3334796, at *5 (S.D.N.Y. Oct. 13, 2009).

The plaintiff also argues that the warning itself evinces pretext, because it lists her comment about Jesus's death as a reason for issuing the warning. However, courts have consistently held that it does not constitute discrimination to discipline employees for making offensive comments in the workplace, even when those comments are tied to religion. See, e.g., Peterson v. Hewlett-Packard Co., 358 F.3d 599, 601-02, 607-08 (9th Cir. 2004) (holding that it was not religious

---

[6] The plaintiff attempts to rebut the defendant's evidence of deficient performance by pointing out that her subordinates complimented her on two occasions. See Pl.'s 56.1 ¶ 91. Two demonstrations of praise by non-decision-makers does not raise an issue of material fact as to whether the decision-makers at issue based their decisions to discipline the plaintiff on the many complaints they received about her and their perception of her performance. See White, 973 F. Supp. 2d at 380.

discrimination for a company to terminate an employee for placing anti-gay messages in his cubicle that "demean[ed] and harass[ed] his co-workers"); Matthews v. Wal-Mart Stores, Inc., 417 F. App'x 552, 554 (7th Cir. 2011) (holding that it was not discriminatory to terminate an employee for expressing that gay people will go to Hell because such comments constituted harassment); Averett v. Honda of Am. Mfg., Inc., No. 07cv1167, 2010 WL 522826, at *8 (S.D. Ohio Feb. 9, 2010) (holding that it was not religious discrimination to discipline an employee for violating a company policy prohibiting abusive and threatening language by stating that "God would punish those employees who taunted and harassed" the plaintiff). The defendant has presented overwhelming evidence that the reason that comment was included in the warning was not because it embodied one of the plaintiff's religious beliefs, but for the same reason that other comments were included in the report -- because the comment was perceived by management to be offensive and inappropriate for the workplace.

Contrary to the plaintiff's assertions, the warning focuses on the plaintiff's general communication deficiencies, and not only on her comment about Jesus's death. The plaintiff's comment to her direct report that "your people killed Jesus" is an example of an inappropriate and offensive comment the plaintiff

made, and its inclusion in the warning does not give rise to an inference of discriminatory animus against the plaintiff.

Because there is no evidence in the record that the alleged actions were taken against the plaintiff for any reason other than her deficiencies, the plaintiff cannot meet even the liberal standards of the NYCHRL. "Even under the NYCHRL, a plaintiff must prove that some forbidden factor . . . factored into the adverse employment action of which [s]he complains." Hill, 2016 WL 1665599, at *12. The plaintiff has not made such a showing, and accordingly the defendant's motion for summary judgment with respect to the plaintiff's discrimination claims is granted.

B.

The plaintiff also brings retaliation claims under Title VII and the NYCHRL.

The plaintiff's Title VII retaliation claim is analyzed under the same three-part burden shifting framework set forth in McDonnell Douglas that governs her discrimination claims. Robinson, 892 F. Supp. 2d at 432. To establish a prima facie case of retaliation, the plaintiff must show that (1) she participated in a protected activity, (2) the defendant was aware of the plaintiff's protected activity, (3) the defendant took an adverse employment action against the plaintiff, and (4) there was "a causal connection between the protected activity

and the adverse employment action." Mazyck v. Metro. Transp. Auth., 893 F. Supp. 2d 574, 591 (S.D.N.Y. 2012).

In December 2014, the plaintiff delivered a letter from her lawyer claiming that the defendant had discriminated against her on the grounds that she had expressed a religious belief. In April 2015, the plaintiff filed a charge with the EEOC, and in June 2015, the plaintiff filed an amended EEOC charge. The plaintiff argues that the disciplinary actions taken against her after she sent the December 2014 letter and filed her EEOC charges, including her placement on a development plan in June 2015 and her termination in August 2015, constitute retaliation for protected activities. However, the plaintiff has failed to show a causal connection between the adverse employment actions and her protected activities, and therefore she has failed to show a prima facie case of discrimination.

To show a causal connection under Title VII, the plaintiff is required to show that her protected activity was the "but for" cause for the alleged retaliatory actions. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 352 (2013). To prevail on her retaliation claim under the NYCHRL, the plaintiff must show that the defendant was "motivated at least in part by an impermissible motive." Mereigh v. N.Y. & Presbyterian Hosp., No. 16cv5583, 2017 WL 5195236, at *6 (S.D.N.Y. Nov. 9, 2017)

(quotation marks omitted). The plaintiff has not met either standard.

In this case, the defendant began taking disciplinary actions against the plaintiff before the plaintiff engaged in any protected activities. The defendant issued the warning against the plaintiff in September 2014, three months before the plaintiff's lawyer sent a letter to the defendant, and seven months before the plaintiff filed her original EEOC charge. "When disciplinary action begins prior to the protected activity, there is no inference of retaliation simply because the adverse action is completed after the protected activity." Jenkins v. N.Y. State. Banking Dep't, No. 07cv6322, 2010 WL 2382417, at *11 (S.D.N.Y. June 14, 2010). Almost all of the alleged retaliatory actions were taken as a result of the plaintiff's September 2014 warning and the failure by the plaintiff to adjust her conduct accordingly. Employees on active warning at Tiffany are not eligible for a bonus or a promotion and cannot receive a performance evaluation with a rating higher than "adequate."[7] That the actions took place after the December

---

[7] The plaintiff argues that it was against company policy for Tiffany to override the weighted average of an employee's scores on a performance review, and that Tiffany violated this policy by giving her an overall score of "adequate." The defendant disagrees and argues that Tiffany policy requires that employees on active warning can receive, at most, a rating of adequate. This dispute is of no moment, because if the plaintiff is correct, at most, the plaintiff has demonstrated that the defendant misunderstood its own policy. Such a mistake is not evidence of discrimination.

2014 letter is not evidence of retaliation, because those
actions followed from the September 2014 warning. Even placing
the plaintiff on the June 2015 development plan and terminating
her in August 2015 were simply continuations of the progressive
discipline that began with the September 2014 warning.

Despite the plaintiff's warning, colleagues continued to
complain to Lacaze, Davis, and HR about the plaintiff's behavior
and communication style, and the plaintiff does not dispute that
other employees complained about her. Those continued complaints
confirmed that the plaintiff had not improved on the same issues
that caused Tiffany to issue the warning -- her communication
and partnering deficiencies. The plaintiff herself admits that
she had to explain or apologize for her comments in the
workplace on at least four occasions both before and after her
protected activities. Pl.'s 56.1 Counter Stmt. ¶¶ 14-15, 51-53,
64, 78, 86; Pl.'s Decl. ¶ 27 & Ex. L.

Although the development plan and termination post-dated
the plaintiff's protected activities, "[w]here timing is the
only basis for a claim of retaliation, and gradual adverse job
actions began well before the plaintiff had ever engaged in any
protected activity, an inference of retaliation does not arise."
Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d
Cir. 2001).

Moreover, the alleged retaliatory termination is too far removed in time to establish causation based on timing. The plaintiff's August 2015 termination occurred eight months after the plaintiff's December 2014 lawyer letter, four months after her first EEOC charge, and two months after her amended EEOC charge. While temporal distance alone is not dispositive, in this case, the timing supports the defendant's argument that its actions were not retaliatory. Indeed, "courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." Avillan v. Donahoe, No. 13cv509, 2015 WL 728169, at *15 (S.D.N.Y. Feb. 19, 2015) (quotation marks omitted).

In her opposition brief, the plaintiff contends that she does not rely solely on timing to establish a prima facie case of retaliation, and purports to put forward direct evidence of retaliation. However, the plaintiff has not pointed to any direct evidence that the defendant was motivated by retaliatory animus in taking progressive disciplinary actions against her. Rather, the plaintiff merely questions the defendant's perception of the plaintiff's job performance.

First, the plaintiff points to her largely positive 2013 performance review, conducted by Davey, to argue that her 2014 performance review, conducted by Lacaze, was retaliatory because

it was negative. As explained above, the fact that the plaintiff received an "adequate" rating of her performance review was a direct consequence of her warning status, which required that she receive at most an adequate rating. This precludes any argument that the performance review was retaliatory, because it was necessitated by a warning that predated any of the plaintiff's protected activity. Moreover, the "mere fact of past satisfactory performance, followed by negative feedback, is not suggestive of impermissible animus . . . ." Missick v. City of New York, 707 F. Supp. 2d 336, 350 (E.D.N.Y. 2010). This is especially true in this case, where the first performance review was conducted by a different manager than the subsequent performance reviews, and the first performance review only evaluated the plaintiff's work during her initial months at the company.

The plaintiff also contrasts the "2014 Tiffany Profilor" -- a review which asks many different colleagues, including the plaintiff's managers, peers, and direct reports, to evaluate her performance -- with her "adequate" 2014 performance review. Although the plaintiff characterizes the 2014 Tiffany Profilor as a positive review because it compliments her work in many respects, it also shows that her managers, her peers, and her direct reports all perceived problems with the plaintiff's communication and leadership skills. Comments from her boss

include that the plaintiff needed "to gain more empathy and good will from her colleagues," and that would only come from "a switch in her behavior." Polido Reply Decl., Ex. 16, at 28. Comments from the plaintiff's direct reports included that the plaintiff needed stronger communication skills with "less harsh delivery/delegation," and less "rude comments." Id. They further noted that she needed to engage in less micromanagement, "has a tendency to be close-minded," and often does not realize "how what she is saying or doing comes across to others." Id. at 28-29. They further remarked that the plaintiff "is rarely open to hearing ideas or recommendations on different approaches to work, always feeling that her way is the best way." Id. at 29. The plaintiff's peers and colleagues echoed these concerns, commenting that the plaintiff needed to be "more sensitive to those around her" and to acknowledge other peoples' points of view. Id. at 28. These comments undermine any notion that the plaintiff's "adequate" performance review by Lacaze was retaliatory.

The plaintiff also argues that the June 2015 development plan was retaliatory because, according to the plaintiff, it was unnecessary. To support this argument, the plaintiff points out that she apologized to many of the colleagues she had previously offended. The plaintiff's argument amounts to a disagreement with the defendant's determination that it was appropriate to

place the plaintiff on a development plan. However, that disagreement is not evidence that the defendant acted with retaliatory animus. Cf. Iverson, 2009 WL 3334796, at *5; Droutman, 2005 WL 1796120, at *9. The fact that the plaintiff concedes she apologized to colleagues because of her remarks is an acknowledgement that she made such offensive remarks.

The plaintiff also believes that the June 2015 development plan was pretextual because similarly situated employees were not placed on similar plans. However, as explained above, the plaintiff has not pointed to any employees with similar communication and leadership deficiencies.

The plaintiff also argues that her August 2015 termination directly evinces retaliatory animus. The plaintiff believes she was fired for giving negative feedback regarding the management development program. The plaintiff says that her managers solicited her honest feedback and argues that by soliciting her honest feedback and then using that feedback as a basis for her termination, the defendant retaliated against her. That the plaintiff was asked for her honest feedback does not undermine the defendant's reliance on its perception that the plaintiff's feedback evinced an unwillingness to improve on her alleged deficiencies, and it certainly does not show that the defendant retaliated against the plaintiff for engaging in protected activity.

The plaintiff also states that her warning was extended in July 2015 to go beyond one year and argues that this purported extension is evidence of retaliation. The only evidence she puts forward to show that her warning was extended is a tape-recorded conversation between the plaintiff and Davis. However, the conversation does not establish that the warning period was extended, and there is no documentation of such an extension in the record. In any event, the plaintiff has not put forward evidence showing that the alleged extension was retaliatory, rather than a reaction to the plaintiff's continued deficiencies.

Because the plaintiff has not shown any causal connection between her protected activity and any adverse employment actions, she has not made out a prima facie case of retaliation under Title VII. The plaintiff has also failed to show that any of the employment actions about which she complains were motivated in any part by retaliation. Therefore, she has failed to show that the defendant retaliated against her in violation of the NYCHRL. Accordingly, the defendant's motion for summary judgment dismissing the plaintiff's retaliation claims is granted.

CONCLUSION

For the reasons explained above, the defendant's motion for summary judgment is **granted**. The Court has considered all of the

arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. The Clerk of Court is directed to enter judgment dismissing this case. The Clerk is also directed to close this case and to close all pending motions.

**SO ORDERED.**

Dated:      **New York, New York**
               **February 11, 2019**

                                  **John G. Koeltl**
                          **United States District Judge**